# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-14-00680-CV

**L. W., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. D-1-FM-13-000422, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

The trial court signed a decree terminating the parental rights of appellant L.W., herein "Jane," to her three-year-old child, herein "John."[1]  As grounds for termination, the trial court found that Jane had not complied with the provisions of a court order that established actions necessary to regain custody and that termination was in John's best interest.  *See* Tex. Fam. Code § 161.001(1)(O), (2).  On appeal, Jane argues that (1) the evidence was legally insufficient to support a finding that termination was statutorily justified and (2) the evidence was factually insufficient to support a finding that termination was in John's best interest.  We affirm the trial court's decree of termination.

---

[1]  The mother and child in this case have similar initials.  For clarity and to preserve their confidentiality, we will refer to them by fictitious names.  *See* Tex. R. App. P. 9.8.  J.H., John's father, filed a relinquishment of parental rights and is not a party to this appeal.

**Procedural Background**

In January 2013, appellee the Texas Department of Family and Protective Services filed an original petition seeking conservatorship of John, who was born in October 2011, and his two sisters, N.M., born in October 2005, and H.W., born in October 2012; proceedings related to N.M. and H.W. were later severed from the case related to John.[2]  In the Department's affidavit in support of conservatorship, caseworker Mikayla Baxter averred that the Department received a report that Jane had been admitted to the hospital for dehydration due to methamphetamine use.[3]  Baxter interviewed Jane, who admitted to weekly methamphetamine use.  John was removed and eventually placed with his paternal grandmother, M.M., in March 2013.  Jane was required to, among other things, participate in individual therapy, complete a protective parenting class, maintain stable housing, undergo a drug abuse evaluation, and submit to random drug testing.  Trial was held in late July 2014, and at the conclusion, the trial court stated that it needed more time and requested that the Department have John evaluated in play therapy.  In September 2014, the Department provided reports from an overall physical exam, a vision exam, a psychological evaluation, and four play therapy sessions.  In late October 2014, the trial court signed the decree of termination.

---

[2]  N.M. and H.W. were placed with their respective fathers, M.J. and C.H.  The Department later agreed to sever the proceedings related to N.M. and H.W., to name their fathers as their sole managing conservators, and to name Jane their possessory conservator.

[3]  In her affidavit, Baxter also recited Jane's history with the Department, which consisted of five allegations of neglectful supervision of N.M., four of which were ruled out and one of which was found "Reason to Believe" and resulted in N.M. being released to M.J.; one allegation of neglectful supervision of an older child, C.M., which was found "Reason to Believe" and resulted in C.M.'s paternal aunt being named permanent managing conservator; and one allegation of neglectful supervision of John, which was ruled out.

## Factual Background

Jane testified that she had used marihuana, methamphetamine, and crack cocaine since she was twelve years old and admitted that she had been using methamphetamine "every few days, every other day, whenever I could get it." However, she said that at the time the Department took custody of her children, she was trying to get sober and had not used methamphetamine for two days; the children were with M.J., her ex-boyfriend and N.M.'s father, and he was the one who had called the Department. In January 2013, she had been homeless for more than a year.

Jane testified that she completed all of her requirements except for one parenting class and denied being discharged from counseling by her first therapist, Elena Scher, saying she was transferred because Scher stopped working for the counseling center. Jennifer Perry was Jane's second therapist, and Jane participated in a protective parenting class as part of her therapy with Perry. Jane and Perry had nine sessions together until Jane's phone number changed while Perry was out of town. Jane testified that she called Perry "numerous times, and she never got back with me until recently," when Perry said that she could only see Jane if Jane was on Medicaid. Jane said she was not eligible for Medicaid and told Perry that she was tired of bouncing from therapist to therapist. Jane testified that she had been seeing a new counselor for about a month and one-half but also admitted she had not been since early June 2014 because she had been working two full-time jobs. Jane also said that she had stopped seeing that counselor because the counselor was "never there" and that she intended to see somebody "as soon as my insurance at work kicks in."

Jane tested positive for methamphetamine in April 2013. She completed a thirty-day in-patient rehabilitation program in August 2013 but relapsed upon her release. She twice missed

3

drug tests in July 2014, explaining that she missed them because she was working. Jane admitted that she had used marihuana and methamphetamine throughout the proceeding and testified that she last used methamphetamine four months before trial and last used marihuana one month before trial.[4]

Jane said that she had completed all but one session of the protective parenting class with Perry and that she took another parenting class while she was in rehab. Jane agreed that she did not always stay in touch with the Department while the case was pending, explaining that she "lost my head" and "couldn't handle" having her children removed. She also admitted that she was using drugs during the time she was out of touch and that she had never provided the Department with proof of employment. Jane said that during this proceeding, she had been homeless, lived in a motel, and lived with a friend. Most recently, she had lived in a shelter for victims of domestic violence for about two and one-half months, and two days before trial, she moved in with M.J. and N.M., where she planned to stay for "[m]aybe two more weeks" until she could get her own apartment. Jane said that she and M.J. were not romantically involved and that he was her "best friend." At the time of trial, Jane was working full-time as a hotel housekeeper and was taking GED classes. She was recently fired from a second job when she had to leave for a drug test. Jane said that about four months before trial, she changed her life, got a job, and stopped using drugs. She was working a twelve-step program and was on the fifth step.

Jane testified that she attended most of her visits with John except for during "the three months that I was gone." She agreed that three months is a long time in a two-year-old's life

---

[4] Jane said that marihuana helped her eat, focus, and resist the urge to use methamphetamine and that she was trying to find a psychologist to help her cease marihuana use altogether.

and said that her missing those visits probably made John feel unloved and unimportant. She also admitted that she sometimes confirmed a visit but then did not appear as promised.

Jane was concerned about John's placement with his paternal grandmother, in part because J.H., John's father, "is incarcerated now for child molestation, and she [M.M.] raised the boy." Jane said she observed the following injuries on John during his time with M.M.: two black eyes; scratches and bruises "all over" his back, arms, and legs; scabs on his elbows; flea and ant bites; and knots on his head. She also testified that John flinches away from her and that during a long visit she had with him in June 2014, he swore and flinched when she told him to do something. Finally, Jane stated that John had begun exhibiting violent, aggressive behavior toward his sisters. However, Jane admitted that in February 2013, before his placement with M.M., she got upset by John "hitting and having aggressive behavior" and blamed it on other children in his foster home.

Department courtesy worker Elizabeth Watkins testified that she had observed numerous visits between John and Jane starting in April 2014 through the end of June 2014. Watkins said that John and his sister N.M. were very close and had a strong bond. She testified that during a recent visit with Jane, John "was really acting strange," flinching and crouching at quick movements toward him. He also asked Jane not to be angry at him for having a dirty diaper. Watkins also said that John refused Jane's request that he take a nap, saying, "No, damn it," and flinching and covering his head when Jane responded with a firm but appropriate voice. Watkins was concerned because John is "usually running around like a little jumping bean, just like happy-go-lucky, laughing, playing, having fun." Watkins explained that John acted normal during that visit "as long as no one did any quick movements toward him or anything like that." Watkins never saw Jane act

inappropriately during her visits, and she said Jane was protective, kind, and a good parent. Watkins never saw John flinch when he was coming from or going back to M.M.

M.J. testified that N.M. had been living with him for the last year and seven months and that he had been declared her custodial parent four or five months before trial. He said that he and Jane had been good friends for over ten years and that he wanted to provide her a place to stay while she got on her feet and where she could spend time with N.M. M.J. described Jane as "a great mom" who loves her children and who had never been abusive to them. M.J. had concerns that M.M. was abusive, noting that John twice came to a visit with a black eye, that he had felt knots on John's head, and that he had observed bruises and scratches on John's body. M.J. related a visit in which he noticed white marks on John's back, saying that when he asked M.M. about the marks, she responded, "[a]ll in the same sentence," "What marks? I don't know. What marks? They were there. I don't know." M.J. also said that he once saw M.M. "holler" John's name and that John "duck[ed]" "like he expected to get hit." M.J. testified that during a visit with N.M. and H.W., John tried to bite, punched, and kicked N.M., and M.M. pulled John over "by his head" and told him to behave. Soon after, John grabbed H.W.'s head "with his thumbs in her eyes, gouging [her] in the eyes." Although M.M. asserted that John was just trying to rub H.W.'s cheeks, M.J. was upset and ended the visit. Finally, M.J. said he had heard John swear and saw him hit Jane in the face. M.J. testified that before John went to live with M.M., he never swore or hit N.M. or Jane. M.J. did not believe the Department had sufficiently investigated his concerns about M.M.'s care of John.

M.J. said Jane had changed and was doing well, keeping a job, being honest, and maintaining her sobriety. He was willing to be involved if John were returned to Jane under the

6

condition that M.J. supervise her. M.J. testified that he had cared for John for years and that John called him "Daddy," and he believed it was in John's best interest to be in M.J.'s home with N.M. and Jane, as a family unit.

M.M. said that when John first came to live with her, "if you came near him, he'd flinch. He was very—he cried all the time. . . . He woke up during the night. . . . [H]e was a very strange child. And then all of a sudden, he opened up and he became very loving. You know, he'd start hugging and—and kissing, and he just changed." M.M. testified that a social worker who observed John in 2013 asked why he was flinching, and M.M. told her, "'I don't know.' I said, 'He did it when I first got him, and then he stopped once he got comfortable with everybody, and then he didn't start it up again until after a visit that we had at my house.'" M.M. described John as "very active" and said he sometimes falls down to make people laugh. M.M. denied spanking John, "thumping" or "flicking" him on his head, or pressing her fingers against his eyes.

M.M. testified that John got a black eye in 2013 when he was hit in the eye while playing with plastic swords, scratched his back when he fell on wet stairs, and bruised his head on a coffee table; M.M. called the Department to report all of those incidents. She did not believe John had had two black eyes and denied that he ever had "welts" on his back. She admitted that John has said "damn it" but denied that he ever used stronger curse words than that, and she testified that she and Jane had both said "damn it" in front of John, to which he responded, "Watch your mouth." M.M. said John had never gotten flea bites but said he once got "covered in mosquito bites" after she let him play outside before she realized there were mosquitos present. M.M. said that during one of John's visits with his sisters, John "was going to pinch H.W.'s cheeks and say cheeks," but M.J.

7

grabbed John's arm and jerked him away. When M.M. told M.J. to let go, he "called CPS on me and said that I was being neglectful or something." M.M. said John started flinching again after that incident. M.M. had never seen John attempt to "gouge" H.W.'s or N.M.'s eyes or hit or kick them, although he had bitten H.W. during his "biting phase" a year before.

M.M. was allowed to supervise Jane's visits with John but only did so for two visits in December 2013. Asked why she stopped supervising those visits, M.M. answered:

> Because most of the time I was the one watching the kids anyways. She was on her computer. And when I—when we went to the store or something, she'd take off with the kids, and I'd [tell] her, "You have to stay here with me." And she'd still take off. She wouldn't listen. So I thought that I wasn't—I'd never gone to a class to supervise a visit, so I thought that I really wasn't qualified to do it. And I didn't feel comfortable doing it.

M.M. did not believe Jane was prepared to be a parent because she "still has a lot that she needs to get straight in her life." M.M. did not believe John was very bonded to Jane, basing that belief "[o]n his reactions" and the fact that he "never talks about her" although he does talk about N.M. She said that John was "a wonderful little boy" and that she wanted to adopt him. She preferred adoption over being named sole managing conservator because Jane told someone that if M.M. got custody of John, "she would kidnap him." M.M. said that if she adopts John, she might allow him contact with Jane if she stays sober. M.M. also said she wanted John to see his sisters. She initially "thought that I just wanted complete, you know, break away. But after thinking about it and praying about it, I realize that that's not fair to [N.M.], it's not fair to [H.W.], and it's not fair to [John]."

M.M. got licensed as a foster parent five months before trial. She has four children and eight grandchildren, who she sees often. M.M. said her son was in prison for sexually assaulting

8

one of her granddaughters and had relinquished his parental rights to John. She also said the Department had specified that S., M.M.'s daughter and the mother of the abused child, could not be alone with John due to a charge of neglectful supervision related to that child.

Caseworker Catherine Hammond was assigned to John's case in September 2013. She testified that Jane disappeared for "a couple of months" before Hammond was assigned and again for three months after she was assigned. Hammond testified that Jane did not remain drug free, participate in all requested drug tests, stay in contact with the Department, or successfully complete individual therapy or her protective parenting class. Jane started individual therapy with Scher in February 2013 but did not successfully complete therapy. She next saw Perry and was unsuccessfully discharged a second time. Jane was then supposed to see a third therapist but told the Department that she did not like "the runaround from the different therapists that CPS was providing, and that she was seeing a therapist at [her shelter] that she liked, so she wanted to see that therapist." Hammond never received "successful discharge paperwork," nor did she ever see evidence of Jane's successful completion of protective parenting classes. Hammond did not agree that Jane was only one class short of completing her protective parenting work with Perry, saying that when Perry left the therapy group, she wanted to see Jane "one last time to kind of wrap up what they had been working on. But it was not my understanding that the therapist would be recommending a successful discharge." Hammond received positive reports from Perry while Jane was attending therapy with her and testified that Jane seemed to be making progress in therapy and that she only stopped seeing her shelter therapist because she got a full-time job.

9

Hammond said that Jane admitted to using drugs during the pendency of the case, that she admitted to using methamphetamine in April 2014 because she was upset when H.W. was placed with her father, and that she admitted in June 2014 that she had used marihuana. In July 2014, Hammond sent Jane text messages asking her to go for a drug test, but Jane did not comply. Hammond testified that the Department sought and obtained an extension of this case because Jane "had just come out of rehab, and we were very hopeful that she would start engaging in her services and show us that she could maintain sobriety, secure housing and employment." However, Hammond said, Jane "continues to engage in drug abuse. She does—didn't have adequate housing for the majority of this case, and she never was able to successfully complete her therapy."

Hammond testified that Jane attended twenty-six of a possible sixty-seven visits with John. She also said Jane sometimes confirmed a visit and then did not show, on "a few occasions" leaving John waiting in the Department's lobby; John did not show a reaction on those occasions. Hammond had observed John with injuries "typical" of a two-year-old, such as bruises on his chin, knees, or legs. She also said that Jane pointed out insect bites and a bump on John's head. Hammond testified that she examined those injuries, that the bites were "normal mosquito bites," and that M.M. had reported that John had bumped his head. Asked about "welts" on John's back, Hammond said, "What I saw were some white marks that looked like old scarring, not welts," and that M.M. told her "they had been there since he was placed with her." Hammond admitted that no one from the Department had noted marks on his back in the past but said she did not usually examine his entire body. Hammond never saw John flinch but when she was told about it by Jane, M.J., Watkins, and another family services provider, she asked M.M. about it. M.M. said "he had

10

been doing that since he's been placed with her." Hammond also spoke with John and repeated the behaviors that others had said triggered his flinching, but John did not flinch in response.

Hammond had concerns about J.H. having sexually assaulted a child and S.'s history with the Department, which barred her from unsupervised contact with John. However, she did not believe M.M. had abused or neglected John and she believed John would be in danger if returned to Jane's care because of concerns about Jane's ability to maintain her sobriety and her housing situation. Hammond believed termination was in John's best interest, saying that he "deserves permanency" and that his adoption by M.M. would give him "peace that this is my permanent home, and not having to worry about [Jane] coming in and out of his life as she chooses."

Rebecca Rosenberg, John's guardian ad litem, testified that she was concerned about John's reported flinching and so carefully re-reviewed his entire record and spoke to M.M. about it. Rosenberg said, "[E]verything I've seen, he's—he's done this from the beginning. And when he gets stressed out, he has behaviors that . . . both [M.M.] and [Jane] end up being concerned that something is going on when he's with the other party." She also said that when John is with M.M. and does not get his way, "he sometimes runs away, but not in a way that suggests he's being hit. I've seen lots of two-year-olds do that."

Rosenberg observed Jane and John for several hours and said that Jane behaved appropriately and that Jane and John appeared to be bonded to each other. She went on to say:

> However, when you look at it over the course of the case, she has not been able to stay sober for any extended period, more than four—four months, if you count that, considering the marijuana test. She has, by her own admission, had some questionable choices of men and associates in terms of being around people who end up being violent towards her. She disappeared for months up until March.

11

Rosenberg said in reaching her recommendation, she spoke with John's former guardian ad litem, read John's file, and thought about his relationships with his sisters, Jane, and M.J. She did not consider Jane's current living arrangements to be a "home that she would bring [John] home to at this time," and she had concerns about Jane's long-term stability and whether she could stay sober when she has to deal with disappointments and other triggers. M.M., Rosenberg said, "seems perfectly capable of taking care of [John], and she seems to interact with him well. She also seems to be a pretty stable person . . . ." Rosenberg favored termination so that John could "have some sort of permanency with" M.M. She also said that, although Jane and John are bonded to each other, it was in John's best interest for M.M. to have discretion to decide whether to allow him to continue to have contact with Jane. She testified that John's former guardian ad litem also recommended termination of Jane's parental rights. Asked whether she was concerned about the possibility of John's relationship with N.M. being severed, Rosenberg testified:

> I really hope that that relationship is maintained. I don't know that—I mean, [M.J.] is not a party to this case, and . . . [Jane]'s rights are limited to supervised visits [with N.M.] . . . . There's a lot of factors there that are outside of our control. I—and I also don't know that it means that terminating parental rights means that that relationship would not happen. But more to the point, I'm not sure that not terminating parental rights means the relationship will happen. All it does mean is that there's a high probability of instability for [John].

## Discussion

Jane asserts that the evidence is legally insufficient to support a finding that termination was justified under section 161.001(1)(O), which provides that termination may be ordered if a parent does not comply with the provisions of a court order establishing actions necessary for her

12

to regain custody of a child who was removed by the Department at least nine months earlier due to abuse or neglect.[5] *See* Tex. Fam. Code § 161.001(1)(O). She asserts that she retained her parental rights to her other two children and completed "a lot of her services"—anger management, basic parenting classes, and drug rehabilitation; obtained a job; obtained stable housing; and was attending AA and NA meetings—and that she had only one protective parenting class left and was working with a therapist. She also argues that the fact that her Department caseworker had said she would be willing to "recommend a conservatorship arrangement" for Jane in the event termination was not ordered "implies that termination on legal grounds would not have been a certain outcome."

Jane provided evidence that she had recently made progress in maintaining her sobriety, as well as finding a full-time job and arranging for stable housing with M.J., at least for the time being. However, that does not change the facts that, during the first year that this cause was pending, she twice disappeared for two to three months, failed or missed drug tests, did not obtain a job, did not successfully complete a protective parenting class, was twice unsuccessfully discharged from individual therapy, and was homeless or in unstable housing situations. Further, she admitted using methamphetamine as recently as four months before trial and marihuana one

---

[5] In considering the legal sufficiency of the evidence in a parental termination case, we review all of the evidence, viewing it in the light most favorable to the decision, and ask whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[L]ooking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. We should disregard evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* We will defer to the factfinder's determination on issues that involve an evaluation of appearance or demeanor, provided that those determinations are not themselves unreasonable. *J.P.B.*, 180 S.W.3d at 573 (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

13

month before trial. Jane's recent progress does not mean that she fully complied with the court's orders issued following John's removal due to neglect. We overrule Jane's first issue on appeal.

As for her argument that the evidence is factually insufficient to support the court's best-interest finding,[6] Jane focuses on her assertions that John's placement with and potential adoption by M.M. is unsafe and inappropriate, that M.M. has abused John, and that S. poses a threat to John, also noting that J.H. was in prison for sexually abusing a child. Further, she notes that the trial court took several months from the time the trial concluded until it rendered its final decision, during which time the Department had John evaluated in multiple play therapy sessions and by a psychologist, and argues that those facts suggest that her rights were terminated because the trial court "felt justified in doing so because of recommendations from professionals." Jane spends little time explaining how John's best interest is not served by the termination of her parental rights, arguing only that there was scant evidence as to the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

Under *Holley*, we are to consider: the child's wishes, if the child is of an appropriate age to express such wishes; the child's present and future emotional and physical needs; present and future emotional and physical danger to the child; the parenting abilities of the individuals seeking custody; programs available to assist those people to promote the child's best interest; plans for the

---

[6] In evaluating the factual sufficiency of the evidence, we view the entire record and will uphold the finding unless the disputed evidence that weighs in favor of the finding but that a reasonable factfinder could not have credited is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the Department's allegations are true. *In re A.B.*, 437 S.W.3d 498, 504 (Tex. 2014) (quoting *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

14

child by the people or agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the parent-child relationship is improper; and any excuse for the parent's acts or omissions. *Id.* "This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Id.* at 372.

Although Jane and M.J. raised concerns about whether M.M. was abusing John, the Department investigated those allegations and believed them to be unfounded. It was for the trial court, as finder of fact, to evaluate the testimony and reconcile conflicts, and we will not second-guess those determinations. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)) (appellate court must defer to all reasonable witness-credibility decisions that rely on appearance or demeanor).

John was too young to express his desires. The Department's witnesses believed that Jane was not able to adequately parent John due to her recent and recurring drug abuse, housing instability, and lack of compliance with the requirements imposed on her, such as individual therapy, protective parenting classes, and staying sober. Jane had been put in touch with several therapists and had not successfully completed therapy or protective parenting. She completed a rehabilitation program but then relapsed. She had made progress recently, including ceasing methamphetamine use and attending AA and NA meetings, but this progress came only in the four months before trial, after this matter had been pending for more than eighteen months. The witnesses largely testified that John is a happy and well-adjusted child who does not have special needs. However, Hammond and Rosenberg believed John needed permanence and a sense of stability and that termination was in John's best interest because it would give him those feelings of permanency and security.

The Department planned for John to be adopted by his grandmother, and Rosenberg and Hammond believed M.M. was a good placement. The psychologist's evaluation filed after trial stated that John would benefit from a "stable, supportive, and nurturing home environment" "similar to his grandmother's house," that he has been doing well with M.M., that he has "likely made consistent progress" as a result of the support and stability found in M.M.'s home, and that he will "likely continue to thrive in this setting." John was described as easily engaged, personable, well-spoken, polite, and happy; he did not exhibit any flinching; and he interacted well with M.M. and other children. The psychologist did not see signs of posttraumatic stress disorder, but because of Watkins's concerns about his flinching, swearing, and other behaviors, the psychologist recommended that John "explore the possibility of abuse further" with a therapist. Given this record, we cannot hold that there is insufficient evidence to support the trial court's finding that termination was in John's best interest. We overrule Jane's second issue.

## Conclusion

Having overruled Jane's issues, we affirm the trial court's decree of termination.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed: April 24, 2015

16