# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-15-00185-CV

---

**A. R., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-FM-13-005220, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

In March 2015, following a bench trial, the trial court terminated the parental rights of appellant A.R. to her son B.R., who was born in October 2012. The trial court found that A.R. knowingly placed or allowed B.R. to remain in surroundings that endangered his well-being, engaged or knowingly placed him with others who engaged in conduct that endangered his well-being, and failed to comply with a court order that set out the actions necessary to regain custody, and that termination of her parental rights was in B.R.'s best interest.[1] *See* Tex. Fam. Code § 161.001(1)(D), (E), (O), (2). On appeal, A.R. challenges only the finding that termination is in B.R.'s best interest. As discussed below, we affirm the trial court's termination decree.

---

[1] B.R.'s father's parental rights were also terminated, and he has not appealed that determination. For purposes of this appeal, we will refer to B.R.'s father as "Antony."

## Factual Summary[2]

A.R. was eighteen when B.R. was born and twenty at the time of trial. She dropped out of high school when she was pregnant with B.R. and has struggled with mental-health issues since at least 2011.[3] A psychological evaluation conducted a year before trial determined that A.R. has borderline intellectual functioning, paranoid and borderline personality traits, adjustment disorder with anxiety, and cannabis abuse. The evaluation stated that her capabilities likely would negatively impact "her ability to effectively process, and respond appropriately in, unfamiliar situations" and "her capacity for successful social and occupational functioning" and that she was "likely to exhibit significant problems exercising appropriate judgment and decision-making."

In May 2013, when B.R. was about eight months old, the Department received a report alleging that A.R. and other members of her household were "frequently seen on the balcony smoking marijuana and the odor from the balcony is very strong" and that she "leaves [B.R.] inside unattended while she's smoking marijuana on the balcony." A.R. admitted that she regularly smoked marihuana while B.R. was in the apartment but said that her mother was present and cared for B.R. at those times. She agreed to undergo a drug and alcohol assessment, take periodic drug tests, and abstain from using illegal drugs. Initial drug tests taken soon after her admission of marihuana use

---

[2] These facts are taken from the testimony and exhibits provided at trial and affidavits filed by the Department. The proceeding consisted of a two-day hearing in early January 2015 and a final one-day hearing held about six weeks later, after the trial court recessed the proceeding so that the Department could conduct home studies and gather more information. We have condensed and summarized the facts for the sake of brevity. *See* Tex. R. App. P. 47.1.

[3] A.R. testified that she suffers from bipolar disorder, depression, and anxiety. Her medical records from October 2011 through August 2014 contain diagnoses for "bipolar I mixed moderate," "schizophrenia, paranoid type," cannabis abuse, post-traumatic stress disorder, and "mood [disorder], unspec, episodic."

2

came back positive, but later test results were negative. However, A.R. admitted to smoking kush[4] once in 2014 when B.R. was not in her care.

In July 2013, the police responded to a disturbance call after A.R.'s boyfriend, Antony, kicked her and B.R. out of the residence where A.R. had been living with Antony. A.R. was erratic, "frustrated and yelling," and she told the police that she had nowhere to go and that she "was going to take her baby and walk the streets, and did not want any of our assistance."[5] The officers calmed her down, and she decided to go to a motel where a family member was staying. Because of her emotional state, the officers did not feel comfortable transporting her with B.R., so they were taken to the motel in separate patrol cars. A caseworker spoke to A.R. after the incident, and A.R. denied that physical violence had occurred and said that Antony was her boyfriend but not B.R.'s father. A.R. signed a safety plan agreeing not to allow Antony to be around B.R.

Carol Morin, a Department supervisor, testified that after A.R. agreed to that safety plan, the Department had hoped to close the case. However, in September 2013, the Department received a report that A.R. had gotten into another physical altercation with Antony, who slapped her in the face and choked her until she passed out. A Department caseworker held a family team meeting with A.R., A.R.'s mother, and other friends and family members. During the meeting, A.R. refused to press charges against Antony, insisting he would never harm B.R.; admitted that she and

---

[4] Kush is a drug related to marihuana. *See* http://www.houstontx.gov/council/c/committee/ 20140918/synthetic.pdf (stating that kush was originally marketed as legal marihuana substitute and is mixture of herbs and spices "sprayed with synthetic compounds that mimic the effects of controlled substances like ecstacy and meth"); https://en.wikipedia.org/w/index.php?title=Kush_ (Cannabis)&oldid=667615551 (defining kush as "subset of strains of Cannabis Indica").

[5] A.R. denied telling the officers that she would walk the streets with B.R.

3

her mother had violated the safety plan by allowing Antony to be around B.R.; and refused the Department's offers of mental health and other assistance. The meeting devolved into chaos, and the family kicked the caseworker out.

After that meeting, Morin said, the Department's intentions changed because caseworkers felt that A.R. "continually put herself in a situation where she was around [Antony], where there was physical violence occurring. She was not understanding how the domestic violence could affect her child should her child ever be around when the domestic violence was occurring." The Department was also concerned about A.R.'s support network because about half of her family members who were involved in her team meetings "felt like she should be allowed to take the baby wherever she wanted to" and "did not feel like [Antony] was a threat" to B.R. or A.R. The Department filed a petition seeking conservatorship, and B.R. was removed from A.R.'s care and placed in foster care on September 16, 2013.

In early July 2014, after A.R. began to be more engaged in services offered by the Department, B.R. was returned to her care on a monitored return basis. A.R. agreed that Antony was to stay at least 200 yards away and that she would call the police if he came to her house or tried to see B.R. A.R. also agreed not to allow B.R. to be alone with or transported by anyone not approved in advance by the Department. About six weeks later, however, A.R. was arrested for assaulting Antony. A.R. testified that the altercation occurred when Antony arrived at a party as she and B.R. were leaving and attacked her. She admitted that she had started yelling at Antony but denied that she had pushed him or pulled on his shirt; she could not explain how Antony's shirt came to be torn and did not recall telling the police that she and Antony "had been together all day." After that

4

incident, B.R. was removed from A.R.'s care and placed with his foster mother Jennifer, where he remained through the time of trial.

In addition to the altercations described earlier, police officers and other witnesses testified about the following alleged incidents involving A.R.:

- In November 2013, the police received a call reporting a physical disturbance between Antony and A.R. When they arrived, A.R. was "hysterical and crying." She said that after they started arguing, Antony pushed her to the ground and then punched or slapped her in the face.

- In December 2013, an officer responded to a family disturbance, and A.R. said she and Antony had gotten into a fight. A.R. told the officer that Antony "gives her money from time-to-time, so she allows him to contact her."

- One week later, the same officer was called to another fight between Antony and A.R., who said that the fight was because "she wanted to go back to school and he didn't want her to," that "they got into a physical fight where he pulled her hair, and scratched her on the face," and that Antony broke her phone "to prevent her from calling 911." A.R. told the officer that she had let Antony into the residence about an hour before the fight started.

- In May 2014, police responded to a family disturbance at Antony's residence, and Antony told the officers that A.R. had refused to leave when asked.

- About two weeks later, the police responded to a disturbance between A.R. and Antony over a small amount of money, and A.R. told the officers that when Antony tried to leave, she followed him and took his phone away.[6] A.R. asked the officers to bring her to a psychiatric facility, so they drove her to an emergency room.

- In late July 2014, A.R. was involved in a physical disturbance with another woman, related to A.R.'s attempts to retrieve some of her belongings. The officer said B.R. was present, sitting in a vehicle belonging to a stranger who had given A.R. and B.R. a ride, and was not in a carseat.[7]

---

[6] A.R. denied telling the police that she had followed Antony or tried to take his phone.

[7] A.R. testified that the man was a family friend, not a stranger.

5

• In August 2014, a crisis-intervention officer was called after a disturbance between A.R. and "her boyfriend." A.R. told the officer she was suffering from depression and bipolar disorder and "had been off of her medications . . . about five days to a week" and was having suicidal thoughts. The officer took her to a medical facility for emergency psychiatric services.

• In early October 2014, when the police responded to "a disturbance hotshot, which is the highest priority calls we have," reporting that "a female had hit another female," A.R. was "[v]ery erratic, moving all over the place, couldn't sit still, screaming, yelling," and told several different stories about what had happened. The police eventually handcuffed her and took her to a hospital because "[s]he stated that she was going to slam her head repeatedly on the hood of our car to kill herself."

• In late October 2014, A.R. and a friend were stopped after police received a report that they "were possibly prostituting." A.R. told the responding officer she felt suicidal and suffered from depression, bipolar disorder, and schizophrenia, and she was transported to a hospital for an emergency detention.

• On Christmas Day 2014, the same officer saw A.R. walking down the street and said it "appeared she was yelling and screaming at herself." The officer was able to calm A.R. down, and she was not taken into custody.

A.R. denied many of the details recounted by the other witnesses, stated that she did not recall some of the described encounters, and denied telling the police that she was schizophrenic or suicidal. She said she did not recall that she had made either of the December 2013 reports, nor did she recall telling officers in early October 2014 that she was going to kill herself by slamming her head into their car, although she admitted that she was transported to a hospital and "locked in a room" that day. She further denied telling officers two weeks later that she wanted to kill herself or being hospitalized for an emergency detention as a result.

Asked whether she thought her mental health could affect B.R., A.R. answered, "It could if I wasn't medicated." A.R. testified that she has been taking her medication regularly for "a

6

couple months now," but she had stopped taking her medication on several occasions in the past, sometimes because she said she could not afford it. When she was asked who she would call if she had a mental-health crisis, she said, "I don't think I would call anybody. I don't even think I would call any police officers anymore." She said if B.R. was returned to her care, she would "[s]tay [off] of drugs, stay away from abusive everything, abusive drugs, abusive people, period."

As far as employment and housing, A.R. testified that she had started helping at a home daycare center on weekends three weeks before trial. She also said that she had been working a full-time retail job since November 2014, later explaining that she was currently only working weekends at the daycare center but that she would be returning to the retail job the following week. In her testimony after the trial recess, however, A.R. said she was interviewing for a restaurant job and had submitted a number of applications and was waiting to hear back. A.R. testified that she had been told she would be able to move into an apartment the week after the trial resumed post-recess.[8] She also said she had a hearing at the end of the month related to the criminal charges resulting from her August 2014 domestic-violence arrest.

Department caseworker Kelley Saddler testified that A.R. was ordered to participate in individual counseling with a focus on domestic violence and protective parenting but was

---

[8] As an alternative to B.R. being returned to her care, A.R. asked the Department to place him with her grandparents or with Antony's aunt. The Department determined that placement with A.R.'s grandparents was inappropriate because they had had very little contact with B.R.; A.R.'s grandmother declined a home study and she said she could not be a placement "because she travels to Mexico very often and because of her age"; and A.R.'s brother, who lived there until three weeks before trial began, had an "extensive criminal history" for burglary, aggravated robbery, theft, and drug possession. The Department also denied placement with Antony's aunt because she indicated she was "not ready to care for [B.R.]," she "does not believe [B.R.] needs protection from" Antony, and she "has no relationship with this child."

unsuccessfully discharged from three therapists. After A.R. was unsuccessfully discharged by her first therapist because of "transportation issues," Saddler arranged for in-home therapy. A.R. was discharged by that therapist "[m]ostly due to missing her appointments,"[9] and never asked for a different therapist or to move the location of her therapy sessions. During the trial recess, the Department arranged for a third therapist to offer home-based individual therapy, but that therapist had difficulty contacting A.R. and said she was "inconsistent and cancelled visits regularly."

Saddler testified that A.R. was also inconsistent in her visitations with B.R., often because she missed her bus. When the Department changed the visitation time in an attempt to accommodate A.R.'s needs, her attendance record stayed the same or got worse. Saddler testified that during the recess A.R. made frequent contact with Saddler but attended only four of seven possible visits with B.R. Saddler said A.R.'s explanation for missing the other visits was that "she was sick, or had other appointments she needed to take care of, or had too much going on. Sometimes she was late, and said that that was due to transportation services." Saddler acknowledged that A.R. and B.R. always seemed excited and happy to see each other and that A.R. had made attempts to comply with Department requirements. However, she noted that despite being hospitalized or detained more than once for mental-health issues, A.R. did not seek Saddler's assistance in obtaining medication or getting back into therapy.

B.R. never appeared to be neglected or physically harmed by A.R., and witnesses said that he seemed to be bonded with A.R. However, A.R. was described as "very back and forth on

---

[9] A.R. testified initially that she had only missed one session because she had to work, then admitted she "call[ed] her like two times" to cancel, then admitted she missed three of six scheduled sessions "because my stepfather wanted his house back to his self."

whether or not she would cooperate" throughout the case, and Department personnel were concerned that her "erratic behavior" and decision-making abilities could place B.R. at risk. Saddler testified that she believed termination was in B.R.'s best interest because A.R.'s behavior while the case was pending—going off her medication, "continuing to put[] herself in domestic violence incidents," threatening suicide, engaging in criminal activity, and using kush after being ordered to abstain from drug use—demonstrated that she could not be a protective parent. Saddler testified that B.R. needed permanency and stability and that A.R. had not demonstrated stability in housing or employment. She did not believe A.R. was able to put B.R.'s needs before her own.

Saddler testified that the Department's intention was for Jennifer, B.R.'s foster mother, to adopt him and that she had no concerns about that placement. Saddler said that B.R. has "learned a lot of routines," seems comfortable, and is going "great" with his foster mother. She testified that B.R. was evaluated during the trial recess and "deemed to not need any services. His improvement was so unbelievably vast [between November 2014 and the recess evaluation] that it was just amazing to see how much speech progress and motor skill development he had gained in these few months."

Jennifer testified that she hoped to adopt B.R. She is employed as a pilot with the Army National Guard and cannot be deployed until the end of 2018. If she should be deployed, she said, her mother, who B.R. calls "grandma," would take care of the children. She said that in his time with her, B.R. has made strides in his language skills and no longer requires speech therapy; his skin, which had been very dry and covered in painful and itchy bumps, has improved; he has become more active and physically competent; and his eating and digestive system have improved.

9

B.R. is affectionate with Jennifer and his foster siblings, he does well at day care and helps around the house, he has "come out of his shell a lot," and he is "a happy kid." Jennifer was asked how she would handle any mental-health issues should they arise, and she explained that her mother, who helps her with B.R. and the other foster children, was a special-education teacher and therefore was familiar with special needs and how to address them.

Jennifer testified that her interactions with A.R. have been pleasant and appropriate, that A.R. seemed like a concerned mother, and that B.R. was never upset after visits with A.R. Jennifer also testified, "I feel like I would be open to contact with his mother if I was awarded placement. I feel like it's very necessary for him to keep in contact with his family and to know where he comes from. As long as it's appropriate and safe, I would absolutely be open to communication and to visits with his mother."

Department supervisor Carolyn Blake testified:

> The department would beg the Court to please not give us Permanent Managing Conservatorship without termination. The worst thing for this child would be for him to grow up in foster care. He desperately needs a forever home where he does not have to worry about being a foster child. I don't want this little boy to go through life for the rest of his years until he's grown to have that stigma of being a foster child. He would have to have a monthly visit with the caseworker. We would have to—we would continue to be in his life until he's grown. Plus also there are concerns regarding statistics that . . . have recently learned, that when the prison population looks for projection of their beds, one of the data that they use are the number of kids that are currently in foster care. Children that grow up in foster care have a much higher rate of engaging in criminal activity. And the department just makes horrible, horrible parents.

Blake thought that Jennifer had done "a phenomenal job" as B.R.'s foster mother and that adoption by Jennifer was in his best interest.

Finally, B.R.'s attorney and guardian ad litem stated in her closing arguments that she believed termination was in B.R.'s best interest because, although A.R. loves her son, she had not completed all of her services or shown she was stable or able to provide a safe environment, B.R. had been thriving in his foster home, he was bonded to his foster mother, he needed a "safe, stable and loving environment," and the Department decided that the placements proposed by A.R. were not appropriate.

**Discussion**

A.R. asserts that the evidence is legally and factually insufficient to support a finding that termination is in B.R.'s best interest because the record shows that he is "extremely bonded" with A.R. and wants to be with her and that A.R. is employed, can provide a stable home, has demonstrated a commitment to not using drugs, is managing her mental health, has cut off contact with Antony and is seeking a protective order against him, is a loving parent, and can provide B.R. "with permanency in a loving home with his family."

In considering the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence, viewing it in the light most favorable to the decision, and ask whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[L]ooking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. We should disregard evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* We defer to the factfinder's

11

determination on issues of credibility that involve an evaluation of appearance or demeanor, provided that those determinations are not themselves unreasonable. *J.P.B.*, 180 S.W.3d at 573 (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)). In evaluating factual sufficiency, we view the entire record and will uphold the finding unless the disputed evidence that a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the Department's allegations are true. *In re A.B.*, 437 S.W.3d 498, 502-03 (Tex. 2014) (quoting *J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25-26 (Tex. 2002)).

A factfinder's best-interest determination is reviewed in light of the factors enumerated in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Under *Holley*, we are to consider: the child's wishes, if the child is of an appropriate age to express such wishes; the child's present and future emotional and physical needs; present and future emotional and physical danger to the child; the parenting abilities of the individuals seeking custody; programs available to assist those people to promote the child's best interest; plans for the child by the people seeking or agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the parent-child relationship is improper; and any excuse for the parent's acts or omissions. *Id.* "This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Id.* at 372.

The evidence in this case shows that A.R. loves B.R., that he interacts well with her, and that she has not physically harmed or neglected him. She has taken steps to be more stable, both in employment and in housing, and she appears to have stabilized her mental-health issues.

12

However, many of those improvements had occurred very shortly before trial, in a proceeding that had been pending for more than fifteen months.

There was testimony that about two weeks before trial began, A.R. was approached by a mental-health officer who was familiar to her and told him that she wanted to hurt herself and that she needed psychiatric care; A.R. testified that she decided not to go to an emergency room because she knew she had a doctor's appointment within a few days. A.R.'s mental-health medical records show an entry from mid-December 2014 stating that she reported "feeling overwhelmed, having bad anxiety and has been off her meds for a few months," and an entry from late December (related to the encounter with the police officer who saw her walking the street and yelling at herself) stating that A.R. said she was "currently homeless," was "having thoughts of wanting to hurt herself," and wanted "to talk to someone due to being off medications for several months, feeling overwhelmed and having anxiety, depression and bipolar." Finally, although A.R. denied having suicidal thoughts, police witnesses testified to two incidents in October 2014 in which A.R. said she wanted to kill herself. A.R. also has a history of going on and off her medications, and a psychological evaluation conducted about a year before trial raised concerns that A.R. was "unable or unwilling to accept personal responsibility for her own actions or for the consequences of those actions."

The evidence related to A.R.'s mental health was relevant to several of the *Holley* factors, including whether A.R. could endanger B.R.'s present and future well-being; the sufficiency of her parenting abilities; her acts and omissions that indicated an improper parent-child relationship; and the adequacy of A.R.'s plans for her and B.R. *See id.* at 371-72. The trial court could reasonably have determined that such evidence weighed in favor of termination.

13

Further, A.R.'s housing and employment, although it had recently become more stable, showed a history of instability and upheaval. A.R. largely lived with her grandparents and believed she was about to obtain an apartment through an assistance program, but had reported as recently as October and December 2014 that she was living with friends or homeless. As far as employment, A.R. testified in January that she had weekend employment and was about to regain weekday employment but then stated after the recess that she was still looking for work. Further, the alternative placements proposed by A.R. were determined to be unsuitable. In contrast, Jennifer had stable employment and housing, and although there was the possibility that she might be deployed in three years, she would have assistance from her mother should that occur. Jennifer stated she was prepared and equipped to deal with any mental-health issues that might arise, she had taken several training classes in order to become a foster parent, and she was educating herself and learning about how best to raise an African-American son when she herself is Caucasian. The evidence was that B.R. was thriving in Jennifer's home and had overcome the developmental delays he had exhibited early in the case. He was reported to be happy, secure, and bonded with Jennifer. *See id.*

On this record, we conclude that the evidence is both legally and factually sufficient to support the trial court's determination that there was clear and convincing evidence that termination was in B.R.'s best interest. We overrule A.R.'s sole point on appeal.

## Conclusion

Having determined that the evidence is sufficient to support the trial court's determination, we affirm the final decree terminating A.R.'s parental rights.

14

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed:   August 12, 2015